James Aggrey-Kweggyirr ARUNGA, Plaintiff,

v.

NEW YORK CITY DEPARTMENT OF PERSONNEL et al., Defendants.

No. 71 Civ. 2116.

United States District Court, S. D. New York.

May 16, 1972.

James A–K Arunga, plaintiff pro se.

Lee Rankin, Corp. Counsel of the City of New York, by Jay A. Kranis, Asst. Corp. Counsel, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

TYLER, District Judge.

This suit for money damages was brought pursuant to provisions of 42 U.S.C. § 1983. The case was tried to the court, and after conclusion of the evidence, the parties were given time to submit post-trial memoranda and proposed findings. On consideration of the evidence and the arguments, the following constitute the findings of fact and conclusions of law of this court. Rule 52, F.R.Civ.P.

### FINDINGS OF FACT

1. Plaintiff ("Arunga") is a native and citizen of Kenya who is presently residing lawfully in the United States and attending the School of Law at Boalt Hall, University of California, at Berkeley.

2. Defendants are various officials of the City of New York.

3. On June 26, 1969, Arunga was hired as a so-called summer crew chief in the Summer Neighborhood Youth Corps Program ("Program") of the City of New York at a salary of $90.00 per week. The Program was funded by the federal government through the United States Department of Labor. It was designed to provide work experience and summer employment to young persons of low income. In 1969, as in other summers of recent years, the City of New York, through its Youth Services Agency as prime contractor, contracted with the Department of Labor to conduct this Program in accordance with federal guidelines. The Youth Services Agency of the City then subcontracted with some 36 other City agencies to conduct portions of the Program. The Department of Personnel of the City of New York was one of the subcontractees and as such, conducted that portion of the Program wherein Youth Corps enrollees were placed in jobs in constituent agencies of the City of New York. Not surprisingly, the number of people hired for various positions in the Program was determined largely, if not entirely, by the amount of funding provided by the Department of Labor. In the summer of 1969, among the employee positions approved by the City and at least inferentially approved by the Department of Labor, were certain categories of temporary personnel consisting of one senior clerk, fourteen clerks, sixteen personnel examiner trainees and 130 summer crew chiefs.

4. Once he was hired on June 26, 1969, plaintiff participated in the training program for the position of summer crew chief. He very shortly requested assignment to a desk job rather than to a field job. This request was granted, and Arunga was assigned to the task of a so-called administrative crew chief rather than those of a supervisory crew chief in the field.

5. It is relevant to note that another part of the Program consisted of an ex-

perimental cultural enrichment project for Neighborhood Youth Corps enrollees in the City Hall area. This enrichment project apparently was operated by the Department of Personnel of the City of New York. Selection of the staff or participants in this enrichment project was based upon individual ability and talent to add to the background experience and teaching of the youngsters enrolled in the Program. Understandably, therefore, assignment to positions in the enrichment project were not limited necessarily to a particular job classification or category.

6. Thus, it is not surprising that Arunga was asked to participate in the enrichment project because, as a native of Kenya and a graduate of a college in Africa, he was especially qualified to foster additional enrichment experiences for the young enrollees. So far as can be determined, Arunga was glad to and did participate in the program just described. At no time, however, did the assignment to the enrichment project either contemplate or actually effectuate a change in his job title or salary. The record also indicates that plaintiff was one of four summer crew chiefs, all of whom had college degrees, who were invited to and did participate in the enrichment project. Conversely, many other summer crew chiefs and personnel examiner trainees had college degrees but were not invited to participate in the enrichment program.

7. While he was participating in the enrichment project, Arunga requested a change in title or job category from summer crew chief to personnel examiner trainee with an attendant increase in salary. His application was considered by a number of City officials, principally within the Department of Personnel, and rejected. There is evidence in the record that this rejection at least in part was based upon the then prevailing New York statute which precluded aliens from being considered eligible for such promotions.

8. Notwithstanding the foregoing, the record also establishes that even if the City officials had not taken the view that plaintiff's alienage precluded his promotion or advance in grade, there were no budget lines or additional openings for a personnel examiner trainee. Put differently, at the time in question, the only way for Arunga to have been promoted to the position of personnel examiner trainee would have been through a budget modification or increase.

9. As might be expected, there is evidence in the record which indicates beyond any doubt that a budget modification or increase in the summer of 1969 at least, was an extremely complicated and time consuming affair, with little or no expectation of success. Moreover, budget modifications, when they were sought, were mandated to accord with the needs of the department in question; needs of the particular individual were not a relevant consideration.

10. Arunga's job in the Program by its terms was scheduled to terminate on August 29, 1969. Hence, the City officials were justified in reasoning that: (1) the time-consuming budget modification application almost certainly could not be completed and passed upon prior to the termination of plaintiff's tenure, and (2) even if the budget modification were approved, the City would get very little time from Arunga in the position of personnel examiner trainee.

11. Thereafter, plaintiff was appointed a senior clerk when an opening in that classification happened to coincidentally occur. He was promoted to this position in order to enable him to conclude a report on his summer experiences and to remain a few weeks longer on the payroll within the Program.

12. During the entire course of plaintiff's appointment, it is true that the assignments carried out by him were included within the range of duties and responsibilities of the summer crew chief. At the same time, it is also true that some of the assignments carried out by plaintiff were within the range of duties and responsibilities of personnel examiner trainee. These overlaps occurred because the classifications of the two positions in question, as is fre-

quently true in civil service terminology, were one and the same.

## DISCUSSION AND CONCLUSIONS OF FACT AND LAW

■ On October 1, 1971, this court filed a memorandum dealing with defendants' motion to dismiss this case on the pleadings. In effect, it was pointed out in that memorandum that plaintiff might make out a case of entitlement to money damages on the ground that he had been unfairly discriminated against in his efforts to seek a promotion during the summer of 1969. Since the time of that memorandum, a three judge panel of this court has ruled that New York Civil Service Law § 53, subd. 1 (McKinney's, Consol.Laws c. 7, 1959) which prohibited aliens from holding positions in the "competitive class" was unconstitutional. See Dougall v. Sugarman, et al., 339 F.Supp. 906 (S.D.N.Y., 1971). Since there can be no doubt that one of the stated grounds and indeed the only ground stated with utmost clarity to Arunga for declining his application for a promotion to personnel examiner trainee was this New York statute, and assuming that the Dougall decision is to be applied retrospectively, it would follow that defendants were legally incorrect.

Nevertheless, I conclude that plaintiff cannot make his case to collect money damages based upon the theory that he should recover the extra income which he would have received had he been promoted to the grade of personnel examiner trainee. I am persuaded by the evidence in the record that it would have been virtually impossible to promote Arunga within the short confines of his summer job tenure, given the complexities of obtaining a budget modification. Indeed, beyond the complexities of that bureaucratic task is the undeniable point that the only possible basis for a budget increase would have been on grounds of preference for Arunga and not for the benefit of the City agencies concerned. Therefore, since even absent any reliance by defendants on the subsequently declared unconstitutional statute, Arunga could not have received a promotion and corresponding salary increase, he has not incurred actual damages in the form of lost compensation.

■ Additionally, however, Arunga seeks money damages as compensation for various alleged physical and psychological problems and expenses which occurred as a result of the unlawful determination of defendants. This claim for damages must also be denied because no evidence was introduced at trial in support thereof.

■ Plaintiff's claims for punitive damages must fail, for there can be no doubt that the defendants were proceeding in good faith under the New York statute as it then pertained and was understood. In short, there is absolutely no evidence that the defendants intentionally discriminated against plaintiff in any way during the summer of 1969.

■ Finally, plaintiff seeks reimbursement for travel expenses which he incurred in coming to New York from Berkeley, California to litigate this case. As my findings of fact have pointed out, the only reason clearly enunciated by defendants to Arunga for denying him the position of personnel examiner trainee was that of his alienage. Arunga, therefore, plainly was entitled to bring this suit to vindicate his constitutional rights. It also cannot be denied that the expenses were reasonable and necessary to enable plaintiff to prosecute this action. Nevertheless, the case law has established certain criteria which must be met in order to enable a plaintiff in a civil rights suit to recover attorneys' fees, including, at least by implication, those expenses of litigation such as travel expenses. Such fees are rarely granted where, as in this case, neither statute nor contract calls for them. Maier Brewing Co. v. Fleischman Distilling Corp., 359 F.2d 156 (9th Cir., 1966), aff'd 386 U.S. 714, 87 S.Ct. 1404, 18 L. Ed.2d 475 (1967); Williams v. Kimbrough, 295 F.Supp. 578 (D.La., 1969). Fees, however, have been granted discre-

tionarily in Section 1983 cases where there is a showing that the defendant's conduct has been willful, unreasonable and obstinate, thereby forcing the institution of a lawsuit to enforce the clear commands of the law. See Bell v. School Board, 321 F.2d 494 (4th Cir., 1963); Rolfe v. County Board of Education, 391 F.2d 77 (6th Cir., 1968); Dyer v. Love, 307 F.Supp. 974 (N.D.Miss., 1969). There has been no such showing in this case; indeed, the facts indicate the absence of willful, obstinate conduct. Not incidentally, it should be noted that until the Supreme Court decision in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), which controlled the decision of the three judge panel in Dougall v. Sugarman et al., *supra*, it was not altogether clear that § 53 was unconstitutional. Although there is much that can be said in favor of plaintiff's position, I conclude that it would be an abuse of discretion to grant any legal fees, including travel expenses, here.

Accordingly, judgment should be entered for plaintiff on the merits and nominal damages are awarded in the sum of One Dollar. Plaintiff's statutory costs are to be taxed to defendants.

It is so ordered.